UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| MEAGAN FINDEISS, CAL FINDEISS, CLEA VAN TOL and LADD VAN TOL, individually and on behalf of all others similarly situated,<br><br>              Plaintiffs<br><br>     v.<br><br>FCA US LLC, a Delaware Limited Liability Company,<br><br>             Defendant. | No.<br><br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiffs Meagan Findeiss, Cal Findeiss (collectively "Findeiss"), Clea Van Tol and Ladd Van Tol (collectively "Van Tol"), (collectively, Findeiss and Van Tol are the "Plaintiffs"), on behalf of themselves and all others similarly situated, including a proposed Nationwide class and Texas and Oregon state classes respectively, as more fully described below, allege the following based on personal knowledge as to their own acts and experiences and as to all other matters, based on the investigation of their counsel:

## I.      INTRODUCTION

1.      This consumer class action arises out of Defendant FCA US, LLC's ("FCA" or "Defendant") manufacture and sale of Chrysler Pacifica Hybrid Minivans, a/k/a Plug-In Hybrid Electric Vehicles or PHEVs, (the Defective Class Vehicles), that were uniformly and dangerously defective, which defect caused them to be prone to catching fire and even exploding, as more fully discussed in Part IV. B. hereafter (the "Hybrid Propulsion Defect").  Defendant FCA sold or caused to be sold such dangerously defective vehicles to consumers, including Plaintiffs, without disclosing their uniform and dangerous defect, respecting which Defendant has yet

1

to remedy and has not yet disclosed its root cause though it appears that the defect is rooted in or connected to the vehicles' high voltage batteries.[1]

2.     Defendant FCA's actions have violated sacred obligations and duties of car manufacturers to both provide consumers with vehicles that are safe and to alert them to, or otherwise warn them of, vehicle defects that implicate serious safety issues and both accept the responsibility to fix or replace each such affected vehicle and absorb the cost to do so rather than requiring or forcing consumer owners of the Defective Class Vehicles to do so.

3.     Although Defendant has been aware of the serious safety risks of the Defective Class Vehicles arising from their dangerous defect, it failed to timely and adequately warn lessees and purchasers or replace or repair said vehicles.  Instead, Defendant FCA has instructed owners or lessees of the Defective Class Vehicles to refrain from plugging in their minivans – in other words charging them – and also to park their vehicles away from buildings or structures, or other vehicles.

4.     Plaintiffs and Class member consumers have been forced into this unacceptable situation by reason of a defect in the hybrid propulsion system that has caused such vehicles to experience fires and even explosions.  There have already been no less than twelve (12) fires reported among the Defective Class Vehicles.

---

[1]     The high voltage batteries are made by LG Energy Solution ("LGES") – the same manufacturer of allegedly defective batteries causing fires in other vehicles such as the GM Bolt and Hyundai electric vehicles.

5. Plaintiffs are informed and believe and thereupon allege that FCA knowingly concealed the Hybrid Propulsion Defect and its consequences from consumers, who were kept unaware that, despite ordinary and customary usage, their vehicle could ignite on fire and explode, with the potential to cause bodily harm and injury, including death, to themselves and others, and cause property damage – whether commercial or residential – including where the vehicle is stored, even though the vehicle has been turned off and is parked.

6. On February 11, 2022, and after receiving numerous complaints and reports of a dozen fires regarding the Defective Class Vehicles connected with the Hybrid Propulsion Defect since 2019, Defendant issued Recall No. 22V-077 (the "Recall") for said vehicles.  See NHTSA, Part 573 Safety Recall Report 22V-077 (February 11, 2022), attached as **Exhibit A** hereto. But despite the Recall, Defendant currently offers no actual remedy for Class members.   Instead, FCA is advising Plaintiffs and Class members not to recharge their electric vehicles and to park them away from structures and other vehicles. This is not a cure, nor a remedy, and further prejudices and harms consumers, including Plaintiffs Findeiss and Van Tol, who purchased their new Chrysler Plug-in Hybrid Electric Vehicles for their use and enjoyment.

7. Because of FCA's breaches of implied warranties and its failure to act more quickly in disclosing and providing a remedy for the Hybrid Propulsion Defect,

3

owners and lessees of Defective Class Vehicles are injured in fact, incurred damages, and suffered ascertainable losses in money and property.  Had Plaintiffs and the putative Class members known of the Hybrid Propulsion Defect, they would not have purchased or leased those vehicles, would have paid substantially less for them, or would have purchased non-hybrid versions of the vehicles, which cost substantially less.  Fires in the Defective Class Vehicles also necessitate expensive repairs, car rentals, car payments, towing charges, property damage, time off work, loss of  use, and other miscellaneous costs.  Moreover,  because of the  Hybrid Propulsion Defect and FCA's concealment, the Defective Class Vehicles have a lower market value and are worth less than they otherwise would be.

8.      Plaintiffs bring this class action to redress FCA's misconduct. Plaintiffs seek damages and a repair under the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 23-1-2312, and the state laws of Texas and Oregon, respectively.

## II.    JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more Class Members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one member of the class of plaintiffs and Defendant are citizens of

different states. This court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

10. This Court has specific personal jurisdiction over Defendant FCA because it is headquartered in Michigan. Defendant has purposefully availed itself of the benefits and protections of the State of Michigan by continuously and systematically conducting substantial business in and from this judicial district, directing advertising and marketing materials to districts within Michigan, and intentionally and purposefully placing the Defective Class Vehicles into the stream of commerce within Michigan and throughout the United States with the expectation and intent that Michigan consumers, along with those of other states, would purchase them. Many thousands of Defective Class Vehicles have been sold in Michigan and are operated within this State and the judicial district.

11. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because FCA transacts business in this judicial district, is subject to personal jurisdiction in this judicial district, and therefore is deemed to be a citizen of this judicial district. Additionally, there are one or more authorized Michigan dealers within this judicial district, FCA has advertised in this judicial district, and FCA has received substantial revenue and profits from its sales and/or leasing of Defective Class Vehicles in this judicial district; therefore, a substantial and material part of

the events and/or omissions giving rise to the claims occurred within this judicial district.

## III.   PARTIES

**A.   Plaintiffs**

### 1.   Meagan Findeiss and Cal Findeiss

12.    Plaintiffs and proposed class representatives Meagan Findeiss and Cal Findeiss, husband and wife, are residents and citizens of Dallas, Texas. They purchased a new 2018 Chrysler Pacifica Plug-in Hybrid vehicle in August, 2019 at Benson Chrysler Dodge Jeep Ram in Greer, South Carolina. The Chrysler Pacifica Plug-in Hybrid purchased by Plaintiffs Meagan and Cal Findeiss is a Defective Class Vehicle equipped with the Hybrid Propulsion Defect. Mr. and Mrs. Findeiss made the decision to purchase their Defective Class Vehicle after being aware of the uniform messaging by Defendant, via its marketing, advertisements, and representations regarding the safety and reliability of the Defective Class Vehicles, which induced and informed their purchase decision. Since purchasing their Defective Class Vehicle, Plaintiffs Meagan and Cal Findeiss have received a Recall Notice for their vehicle. Mr. and Mrs. Findeiss are fearful driving the vehicle due to the risk of explosion and fire and are concerned about the proximity of their vehicle to their home given the Hybrid Propulsion Defect and the consequent risk of fire.

### 2.  Clea Van Tol and Ladd Van Tol

13.  Plaintiffs and proposed class representatives Clea Van Tol and Ladd Van Tol, husband and wife, are residents and citizens of Portland, Oregon. They purchased a new 2018 Chrysler Pacifica Plug-in Hybrid vehicle in October 2018 at the Lithia Chrysler Dodge Jeep Ram of Portland dealership located in Portland, Oregon. Plaintiff Van Tol's Chrysler Pacifica Plug-in Hybrid is a Defective Class Vehicle equipped with the Hybrid Propulsion Defect. The Van Tol's made the decision to purchase their Defective Class Vehicle after being aware of the uniform messaging by Defendant, via its marketing, advertisements, and representations, regarding the safety and reliability of the Defective Class Vehicles, which induced and informed Plaintiffs' purchase decision. Plaintiffs Van Tol are fearful driving their vehicle due to its risk of explosion and fire.

14.  Defendant widely disseminated throughout America statements assuring customers that the Defective Class Vehicles were the "most family friendly minivan in its class" and that "[y]our family's safety and security are what matters most." (**Exhibit B** hereto).

15.  Despite touting the safety, reliability, and dependability of the Defective Class Vehicles, neither Defendant nor its agents, dealers or representatives, disclosed to Plaintiffs the vehicles uniform defect.

16.    Plaintiffs have now been left with a dangerous and defective vehicle because of the Hybrid Propulsion Defect, which defect has diminished and shall continue to diminish the market value of the Defective Class Vehicles. Plaintiffs have been left with electric vehicles that they are instructed to refrain from charging, forcing them to pay for gas that is more expensive than the cost of electricity. Plaintiffs' vehicles could catch fire at any time, creating an imminent risk of injury or property damage.

17.    Plaintiffs would not have purchased the vehicle, or would certainly have paid considerably less for it, had they known of the defect discussed herein.

**B.    Defendant**

18.    Defendant Fiat Chrysler Automobiles (FCA) US, LLC ("FCA"), formerly known as Chrysler Group, is a Delaware limited liability company organized and existing under the laws of the State of Delaware, and is wholly owned by Stellantis N.V., a Dutch corporation headquartered in Amsterdam, Netherlands. FCA's principal place of business and headquarters is at 1000 Chrysler Dr., Auburn Hills, MI 48326.

19.    At all times relevant herein, Defendant was engaging in the business of designing, manufacturing, constructing, assembling, marketing, distributing, and selling automobiles and other motor vehicles and motor vehicle components in the United States.

20.     FCA offers passenger cars, utility vehicles, minivans, trucks, and commercial vans, as well as distributes automotive service parts and accessories. As the North American arm of Fiat Chrysler Automobiles, FCA manufactures a range of vehicle under its Fiat and Chrysler brands, including Jeep, Ram, Dodge, Alfa Romeo, and Abarth at 45 plants in the United States and Mexico. It ships about 2.5 million vehicles every year. It also features its parent's trademarked MOPAR automobile parts and service brand which carries more than 500,000 parts, options, and accessories for vehicle customization.

21.     From its headquarters in Michigan, Defendant FCA marketed the Defective Class Vehicles to consumers.

22.     FCA and/or its agents designed and manufactured the Defective Class Vehicles. FCA also developed and disseminated the owner's manuals and warranty booklets, advertisements, brochures, and other promotional materials relating to the Defective Class Vehicles, with the intent that such documents be purposely distributed throughout all fifty states. FCA is engaged in interstate commerce, selling vehicles through its network in every state of the United States.

23.     As further detailed below, FCA-authorized automobile dealerships to act as FCA's agents in selling automobiles under the FCA name and disseminating vehicle information provided by FCA to customers. At all relevant times, FCA's dealerships served as its agents for motor vehicle repairs and warranty issues because

they performed repairs, replacements, and adjustments covered by FCA's manufacturer warranty pursuant to the contracts between FCA and its more than 2,000 authorized dealerships nationwide.

## IV. FACTUAL ALLEGATIONS

**A.  Defendant FCA – Possessing Decades of Auto Vehicle Design, Engineering, and Manufacturing Experience – Sells Defective Class Vehicles Through Its Authorized Agents and Dealers**

24.     Every manufacturer of a motor vehicle to be sold to and/or driven by consumers is to produce and provide a safe vehicle that is free of dangerous defects. It was incumbent on FCA to do so, and, at a minimum, to warn consumers of any safety defect and replace such Defective Class Vehicles and/or appropriately repair any such defect whenever the manufacturer becomes aware that the vehicles it has manufactured and/or sold to consumers exposes them to serious safety issues by reason of a defect.

25.     The Defective Class Vehicles manufactured and sold by Defendant FCA were dangerously defective and prone to catching fire and exploding.  Faced with such knowledge, Defendant did nothing for a material period of time to either warn owners or lessees, otherwise provide them with a true and effective remedy for the defect, or replace their Defective Class Vehicles with one that was not defective.

26.     The Defective Class Vehicles contain a defect as more fully discussed in Part IV B hereafter, which Plaintiffs are informed and believe and thereupon

allege is referred to as the "Hybrid Propulsion Defect" within the hybrid propulsion system.

27.     Defendant FCA, formerly known as Chrysler Group, LLC, has been in the business of designing, manufacturing and selling cars for decades.  It has been engaged in the business of designing, manufacturing, constructing, assembling, marketing, distributing, and selling automobiles and other motor vehicles and motor vehicle components within the United States at all times material.

28.     FCA is the North American arm of Fiat Chrysler automobiles.  It manufactures various vehicles under the Fiat and Chrysler brands, including Jeep, Ram, Dodge, Alpha Romeo, and Abarth at numerous plants throughout the United States, shipping about 2.5 million vehicles every year.  At all times material hereto, Defendant FCA marketed the Defective Class Vehicles to consumers in the ordinary course of its business.  It effects the sale of its vehicles through its agents, including FCA dealerships.  Plaintiffs are informed and believe and thereupon allege that FCA acknowledges that its authorized dealerships are its sales agents.  And its dealers have accepted that undertaking.  FCA controls authorized FCA dealers and acts as a principle in the FCA – dealership agency relationship.

29.     In that regard, FCA has the ability to terminate relationships with dealers at will, sells them vehicles that it manufacturers, for the dealers to then sell

to the public, gives dealers the resources needed to sell such vehicles and supervises them on a continuous and regular basis.

30.     In turn, dealers are required to report their sales to FCA, connect their computer networks with that of FCA's, submit to the training of their sales and technical personnel, use FCA's supplied computer software and establish and maintain service departments within the FCA dealerships that use and utilize FCA approved parts and services.

31.     Dealers benefit from the marketing and advertising that FCA provides and also are required to display FCA logos on signs, literature, brochures, and various marketing material, and on various products displayed within the FCA dealerships and/or that are advertised publicly through various mediums by dealers.

32.     Plaintiffs are further informed and believe and thereupon allege that dealerships impose legal obligations upon FCA with respect to warranty repairs that they sell and issue service contracts that FCA administers.  Beyond this, FCA exercises substantial control over its dealers.  To that end, FCA provides financial incentives to dealer employees, selects that locations where dealerships can be maintained or operated, requires dealerships to comply with FCA's policies and procedures, and effectively controls dealership profits by allocating the number of FCA automobiles to each dealer.  FCA does not receive payment for the cars that are sold until the dealerships sells them because the dealers are selling those cars on

FCA's behalf pursuant to a "floor plan." Dealers also bear FCA's brand names, use its logos and advertising, bear FCA's name on warranty repair orders, and enjoy a franchise to sell FCA's products, including the Defective Class Vehicles.

33.     At all times material, FCA dealers are required by Defendant to follow FCA's rules and policies with respect to how they conduct all aspects of their business, including honoring FCA's warranties and/or otherwise providing warranties, and even the servicing of Defective Class Vehicles. FCA's effective management and control over its agents and dealers is ubiquitous. It covers virtually every aspect of a car dealer's business including the performance of warranty diagnosis and repairs which must be done in accordance with FCA's procedures and policies, the use of parts and tools which are provided by FCA or approved by Defendant, and even informing FCA when it is discovered that unauthorized parts have been installed in one of Defendant's vehicles which the dealer repairs or inspects.

34.     FCA further requires dealers to provide it with monthly statements and records pertaining, in part, to their sales and servicing of FCA vehicles.

35.     FCA provides technical services, bulletins, and messages to its dealers. These announcements or pronouncements detail chronic defects presented in product lines and repair procedures that must be followed for chronic defects. Related to this, FCA provides dealers with trained service and repair consultants

with whom the dealers are required by FCA to consult when they are unable to correct the vehicle defect on their own.

36.     In addition, it is incumbent on dealers, as required by FCA, to notify FCA in every instance when a car is sold or put into warranty service.

**B.     The Hybrid Propulsion Defect**

37.     FCA acknowledges by its February 14, 2022 notification of a safety recall sent to the National Highway Traffic Safety Administration ("NHTSA"), that a defect in the Hybrid Propulsion System can cause the Defective Class Vehicles to spontaneously burst into flames.   Defendant also admits that "[a] vehicle fire can occur when parked, even with the vehicle in the off position."

38.     FCA failed to adequately research, design, test, and manufacture the Defective Class Vehicles before warranting, advertising, promoting, marketing, and selling them as suitable and safe for use in an intended and reasonably foreseeable manner by consumers.

39.     Although FCA claims that the root cause of the Hybrid Propulsion Defect is unknown, the nature of the fires and the fact they can occur even while the vehicle is not running, strongly suggesting that the defect is connected to the high-voltage lithium battery that powers the electric propulsion of the Defective Class Vehicles.

40.     The high-voltage batteries in the Defective Class Vehicles are 16-kWh lithium-ion batteries made by LG Chem (now LG Energy Solution, or "LGES").

41.     LGES also made the batteries that allegedly caused fires in GM's Bolt EV and Bolt EUV cars built from 2017 to 2022. As a result, LGES agreed to pay GM $1.9 billion for the costs of a recall of those GM cars.

42.     In addition, LGES made the batteries used in 2017 to 2020 Hyundai vehicles that were recalled in February 2021 to address a battery defect that posed a fire risk.

43.     LGES issued the following statement in response to FCA's recall of the Defective Class Vehicles:

> There is no confirmed root cause of fires in the STLA vehicles that is subject to the recall, or proof directly linking to the battery, as mentioned in its statement. Considering STLA's statement, LGES has no further comment.

44.     So far, FCA has only recalled the 2017 and 2018 Pacifica Hybrids. However, FCA has continuously sold Pacifica Hybrids to this day, and continues to use LGES 16-kWh lithium-ion batteries.

45.     Accordingly, Plaintiffs' counsel continues to investigate whether additional model years of the Pacifica Hybrid are also plagued with the Hybrid Propulsion Defect.

## C.     The Hybrid Propulsion Defect causes sudden fires and explosions in the Defective Class Vehicles

46.     On information and belief, FCA knew or should have known about the Hybrid Propulsion Defect long before it disclosed the problem, as evidenced by: (1) consumer complaints lodged with NHTSA and elsewhere online; (2) consumer complaints lodged with FCA directly; and (3) other similar fire issues in GM Bolts and Hyundai vehicles that (like the Defective Class Vehicles) use LGES batteries for electric propulsion.

47.     No later than fall 2018, Pacifica owners and lessees began complaining that their Defective Class Vehicles suddenly caught fire.

48.     All vehicle manufacturers, including FCA, are required by law to routinely monitor and analyze NHTSA complaints to determine whether vehicles or components should be recalled due to safety concerns. Thus, FCA has knowledge of all NHTSA complaints filed concerning the vehicles it manufacturers, including the Defective Class Vehicles. *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

49.     Complaints submitted to FCA and to NHTSA via Vehicle Owner Questionnaires ("VOQ") reveal multiple instances of Defective Class Vehicles catching on fire.

50.     As one Affected Vehicle owner stated in a complaint to NHTSA in 2018, only "[t]wo weeks" after purchasing a new Pacifica, "the engine started smoking and caught fire while I was driving my family" on a Washington highway.

**D.     FCA Manufactured and Sold Dangerously Defective Class Vehicles to Consumers that it Marketed as Safe**

51.     The Defective Class Vehicles are "plug-in" hybrid vehicles.  Typically, plug-in hybrids are viewed as being better than ordinary hybrid vehicles because they can be charged and driven on affordable electricity.  A hybrid plug-in is powered by an electric motor and uses an internal combustion engine as its back-up in the event that the motor's battery is no longer able to fuel the vehicle.

52.     Hence, the ability of the Chrysler Pacific PHEV to recharge its own battery by simply plugging it into a recharging station is a significant advantage and one of the primary considerations for purchasers or lessees of electric vehicles.  This feature enables consumers to save money and produce less emissions, which is one of the fundamental factors that has advanced the electric car industry:  environmental concerns.  According to Consumer Report 71% of respondents when surveyed indicated that they would likely chiefly charge their vehicles at home.  Preston, Benjamin.  "Consumer Reports Survey Shows Strong Interest in Electric Cars." *Consumer Reports*.

53.     FCA represented that the Pacific Hybrid was "America's first-ever Hybrid minivan" averaging 84 mpg.  The ability to run an electric power was a major selling point and the ability to power the car by plugging it into a recharging station was also a significant feature.

54. FCA's sales brochure for the 2018 Pacifica hybrid represented a "mission for reducing emissions" while that same brochure touted the electric driving ability of the Defective Class Vehicles.

55. Defendant informed and represented consumers of the 2017 Chrysler Pacifica PHEV minivan that it was well suited for "family utility" and a "Family's Active Lifestyle." FCA emphasized that the minivan was a "family room on wheels" and reassured consumers that "your family's safety and security are what matters most."

56. FCA emphasized the 2017 Chrysler Pacifica PHEV as having "100+ standard and available safety and security features," while representing in its advertising literature and materials that "paramount to helping protect you and your family is over 100 standard and available safety and security features that automatically react in the blink of an eye."

57. Defendant stated and advertised to consumers that the 2018 Chrysler Pacifica PHEV minivan was "here to serve your real life with care as the most family friendly minivan in its class," while emphasizing the 2018 minivan's many safety and security features. Beyond noting FCA's mission for reducing emissions, consumers were also informed that the vehicle would help them achieve "savings," and were told that the 2018 Chrysler Pacifica PHEV had a "33 mile electric driving

range" and "less dependent on gas, helping you produce less emissions for a greener planet."

58.     FCA's marketing campaign was especially prominent with respect to California consumers where it is estimated that 40% of all hybrids are sold in the State of California – the biggest minivan market in the country.  FCA boasted that the Chrysler Pacifica hybrid is the "official family vehicle for California," according to Tim Kuniskis of FCA.

59.     FCA's sales brochures were replete with pictures of children in the Defective Class Vehicles in addition to describing an extensive set of safety features. One of its brochures for the 2018 Pacifica stated that "[y]our travels will inspire while ensuring the wellbeing of all your beings with over 100 standard and available safety security features."

60.     In truth, and contrary to FCA's representations, there have been multiple instances of Defective Class Vehicles catching on fire.

61.     Complaints have been reported to NHTSA, including, for example, among others:

> June 15, 2019 NHTSA ID NUMBER: 1220341
> Components: ELECTRICAL SYSTEM, ENGINE,
> FUEL/PROPULSION SYSTEM
> NHTSA ID Number:  11220341
> Incident Date June 15, 2019
> Consumer Location FORTH WORTH, TX

19

Vehicle Identification Number 2C4RC1N74JR****

Summary of Complaint: PHEV VAN WAS CHARGING OVERNIGHT WHILE PLUGGED INTO HOUSE OUTLET (110V) USING MANUFACTURER SUPPLIED CHARGING CABLE. AT AROUND 7 AM WE HEARD AN EXPLOSION AND FOUND THE VAN BURNING IN OUR DRIVEWAY. VEHICLE AS QUICKLY ENGULFED IN FLAMES. FIRE TRUCK PUT IT OUT AFTER ARRIVING (~5-6 MINUTES, I THINK). NO ONE WAS INJURED, IN OR NEAR THE CAR WHEN IT HAPPENED. A NEST CAMERA ACROSS THE STREET SHOWED THAT THE VEHICLE WAS SMOKING PRIOR T OTHE EXPLLSION. *BF*JB*DT*DT*DT INFORMATION REDACTED PURSUANT TO THE FREEDOME OF INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6). *JB *TR 1 Affected Product? CHRYSLER PACIFICA HYBRID 2018

January 14, 2020 NHTSA ID NUMBER: 11299263
Components: ELECTRICAL SYSTEM NHTSA ID Number: 11299263
Incident Date September 20, 2019
Consumer Location KALAMAZOO, MI
Vehicle Identification Number 2C4RC1N73JR****

Summary of Complaint: AS OF 1/14/20 CHRYSLER AND KEVIN PIKE FROM NEDERVELD ARE STILL INVESTIGATING. ON 9/20 AROUND 5AM WE WERE AWOKE TO AN EXPLOSION SOUND. IT WAS OUR GARAGE DOOR BEING BLOWN TO THE STREET AND THE INTERIOR GARAGE DOOR BEING BLOWN INWARDS. THIS WAS DUE TO A FIRE THAT STARTED IN OUR GARAGE CONFIRMED TO HAVE STARTED WHERE THE PACIFICA WAS PARKED. THE PACIFICA HAD BEEN PLUGGED IN TO A JUICEBOX CHARGER PROFESSIONALLY WIRED WITH A DEDICATED 220V OUTLET SINCE AROUND 7PM THE PREVIOUS EVENING. I BELIEVE SOMETHING MALFUNCTIONED WITH THE CAR'S ELECTRIC BATTERY CAUSING IT TO START A FIRE THAT BUILT UP IN THE GARAGE AND EVENTUALLY CAUSED A TOTAL LOSS OF OUR HOME AND EVERYTHING INSIDE IT. WE DID NOT HAVE ANY OTHER FLAMMABLE OR

EXPLOSIVE SUBSTANCES IN THE GARAGE BESIDES A 1 GALLON GAS CONTAINER ON THE OTHER SIDE OF THE GARAGE CONFIRMED TO NOT BE NEAR THE START OF THE FIRE. THE VEHICLE HAD BEEN COMPLETELY DRAINED OF BATTERY THE PREVIOUS DAY, PLUGGED IN AND WAS CHARGING OVERNIGHT. THIS DESCRIPTION ALSO MATCHES THE SAME DESCRIPTION 2 OTHER FAMILIES HAVE POSTED ONLINE OF THEIR PACIFICA CATCHING FIRE BUT THEIR VEHICLES WERE PARKED OUTSIDE SO DID NOT BURN DOWN THEIR HOMES AND NO INVESTIGATION WAS CONDUCTED. *DT*JB*DT *DT*JB*DT*JB*DT THE CONSUMER PROVIDED PHOTOS. *TR

1 Affected Product: CHRYSLER PACIFICA HYBRID 2018

62.    FCA has been aware of the serious risk of explosion and fire in the Defective Class Vehicles.  Despite such knowledge it failed to remedy the problem and only recently issued its 2022 Recall.

63.    FCA's Technical Safety and Regulatory Compliance organization began investigating "a potential trend in fires" in certain Pacifica Hybrids on August 31, 2021.  It bought back two vehicles "for origin and cause investigation," in September 2021 and January 2022, but claimed that "[t]he cause of these fires is under investigation."  FCA has been "aware of ten additional fires," the "cause of which is under investigation."  FCA, received twelve field reports concerning these fires between "April 23, 2019, to December 14, 2021."

64.    However, it was not until February 6, 2022 that FCA's Vehicle Regulations Committee decided "to conduct a voluntary safety recall of the

Defective Class Vehicles." **Exhibit A**. Still FCA has not yet remedied the defect, electing instead to advise the owners and lessees of the Defective Class Vehicles "to refrain from charging them, and to park them away from structures and other vehicles." **Exhibit A**. FCA should, but has not, offered to buy back the vehicles and has not even offered to provide loaner vehicles until such time as it can fix the problem.

65. This is not the first time that FCA has been forced to recall Pacifica Hybrids that were at risk of igniting. FCA previously recalled over 10,000 2017 and 2018 Pacifica Plug-In Hybrid minivans in 2018 for a fire issue related to the vehicle's fuel system, stating that "[A]fter the vehicle has been operating in PHEV propulsion mode, the gas-fueled engine may not restart properly resulting in unburned fuel entering the exhaust catalyst." (Recall No. 18V740000).

66. There was a recall of Pacifica Plug-In Hybrid minivans in 2020 due to a fire risk resulting from a corroded electrical connection involving the Pacifica's 12-volt battery system (Recall No. 20V334000). At that time – similar to the current recall – FCA advised Pacifica hybrid owners to park their vehicles outdoors and away from other vehicles.

## E. The Proposed Recall is Insufficient to Remedy the Harm to Class Vehicle Owners and Lessees

67. On February 11, 2022, more than three years after the first known incident of fire in the Class Vehicles, and more than six years after FCA US, LLC

began manufacturing and distributing Class Vehicles, FCA announced its intent to recall nearly 20,000 vehicles that "may experience a fire, even with the ignition in the 'OFF' mode," which can result in "increased risk of occupant injury and/or injury to persons outside the vehicle, as well as property damage." **Exhibit A**.

68.    FCA notified consumers that a "remedy is under development" and the "root cause is unknown." **Exhibit A**. Defendant also notified consumers that:

> A remedy is under development. Until further notice, the company is advising owners of these hybrid vehicles to refrain from recharging them, and to park them away from structures and other vehicles.
>
> FCA US has a longstanding policy and practice of reimbursing owners who have incurred the cost of repairing a problem that subsequently becomes the subject of a field action. To ensure consistency, FCA US, as part of the owner letter, will request that consumers send the original receipt and/or other adequate proof of payment to the company for confirmation of the expense.

**Exhibit A**.

69.    This so-called "fix" leaves consumers with a vehicle that is nearly useless and at risk of immediate fire-resulting in harm to Class Vehicle owners and lessees.

70.    FCA has been aware of the unexpected fires since at least 2020, the date of its first fire-related recall of 27,634 Chrysler Pacifica PHEVs. Even after the 2020 recall, fires are continuing to occur.

71.    Defendant's knowledge of the unexpected fires, and its subsequent inaction, has resulted in harm to Plaintiff and Class Members.

## V.     TOLLING OF THE STATUTE OF LIMITATIONS

### A.     Discovery Rule Tolling

72.     Because FCA concealed the existence of the Hybrid Propulsion Defect, Class members had no way of knowing about the unreasonable fire risk of the Defective Class Vehicles.

73.     Within the period of any applicable statutes of limitation, Plaintiffs and members of the proposed Classes could not have discovered through the exercise of reasonable diligence that FCA was concealing the conduct complained of herein.

74.     Plaintiffs and the other Class members did not discover, and did not know of, facts that would have caused a reasonable person to suspect that FCA did not report information within its knowledge to federal and state authorities, its dealerships, or consumers; nor would a reasonable and diligent investigation have disclosed that FCA had concealed information about the unreasonable fire risk of the Defective Class Vehicles, which was discovered by Plaintiffs only shortly before this action was filed.

75.     For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to the Defective Class Vehicles.

### B.     Fraudulent Concealment Tolling

76.     All applicable statutes of limitation have also been tolled by FCA's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the period relevant to this action.

**C.     Estoppel**

77.     FCA was under a continuous duty to disclose to Plaintiffs and the other Class members the true character, quality, and nature of the fire risk of the Defective Class Vehicles.

78.     FCA knowingly, affirmatively, and actively concealed or recklessly disregarded the true nature, quality, and character of the fire risk of the Defective Class Vehicles.

79.     Based on the foregoing, FCA is estopped from relying on any statutes of limitation in defense of this action.

## VI.     CLASS ALLEGATIONS

80.     Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to the provisions of Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following classes:

> **Nationwide Class:** All persons or entities who purchased or leased one or more model year 2017-2018 Chrysler Pacifica Hybrid minivans (the "Defective Class Vehicles").

> **Texas Class:** All persons or entities in the state of Texas who purchased or leased one or more model year 2017-

2018 Chrysler Pacifica Hybrid minivans (the "Defective Class Vehicles").

**Oregon Class:** All persons or entities in the state of Oregon who purchased or leased one or more model year 2017-2018 Chrysler Pacifica Hybrid minivans (the "Defective Class Vehicles").

81.     Plaintiffs assert claims under the federal law or the law of each state as set forth below.

82.     Excluded from each Class are individuals who have personal injury claims resulting from the fires or explosions caused by the Defective Class Vehicles. Also excluded from the Class are FCA and its subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; the Judge to whom this case is assigned and his/her immediate family; and Plaintiffs' Counsel. Plaintiffs reserve the right to revise the Class definition based upon information learned through discovery.

83.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

84.     This action has been brought and may be properly maintained on behalf of the Classes proposed herein under Federal Rule of Civil Procedure 23.

85.     **Numerosity**: Federal Rule of Civil Procedure 23(a)(1): The members of each Class are so numerous and geographically dispersed that individual joinder

of all Class members is impracticable. For purposes of this complaint, Plaintiffs allege that there are estimated to be 16,700 or more Defective Class Vehicles in the Nationwide Class. The precise number of Class members is unknown to Plaintiffs but may be ascertained from FCA's books and records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

86.     **Commonality and Predominance**: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3): This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

a)   Whether FCA engaged in the conduct alleged herein;

b)   Whether the Hybrid Propulsion Defect creates an unreasonable risk of fires in the Defective Class Vehicles;

c)   When FCA first knew about the Hybrid Propulsion Defect;

d)   Whether FCA designed, manufactured, marketed, and distributed the Defective Class Vehicles with defective high-voltage batteries;

e)   Whether FCA's conduct renders it liable for breach of the implied warranty of merchantability;

f)      Whether FCA has been unjustly enriched at the expense of Plaintiffs and the Classes;

g)   Whether Plaintiffs and the other Class members overpaid for their vehicles at the point of sale; and

h)   Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

87.     **Typicality**: Federal Rule of Civil Procedure 23(a)(3): Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through FCA's wrongful conduct as described above.

88.     **Adequacy**: Federal Rule of Civil Procedure 23(a)(4): Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Classes they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The Classes' interests will be fairly and adequately protected by Plaintiffs and their counsel.

89.     **Superiority**: Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered

by Plaintiffs and the other Class members are relatively small compared to the burden

and expense that would be required to individually litigate their claims against FCA,

so it would be impracticable for the members of the Classes to individually seek

redress for FCA's wrongful conduct. Even if Class members could afford individual

litigation, the court system could not. Individualized litigation creates a potential for

inconsistent or contradictory judgments and increases the delay and expense to all

parties and the court system. By contrast, the class action device presents far fewer

management difficulties and provides the benefits of single adjudication, economy

of scale, and comprehensive supervision by a single court.

## VII.     CLAIMS

### A.     Nationwide Claim

**COUNT I
VIOLATION OF THE MAGNUSON-MOSS WARRANTY
ACT
15 U.S.C. § 2301, *ET SEQ.*
(On behalf of Plaintiffs and the Nationwide Class)**

90.     Plaintiffs re-allege and incorporate by reference all paragraphs as

though fully set forth herein.

91.     Plaintiffs bring this Count on behalf of a Nationwide Class (collectively

for purposes of this Count, the "Magnuson-Moss Class").

92.     This Court has jurisdiction to decide claims brought under 15 U.S.C. §

2301 by virtue of 28 U.S.C. § 1332(a)-(d).

93.     The Defective Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). The Plaintiffs and Magnuson-Moss Class members are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its implied warranties.

94.     FCA is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

95.     15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

96.     FCA provided Plaintiffs and Magnuson-Moss Class members with an implied warranty of merchantability in connection with the purchase or lease of their vehicles that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). As a part of the implied warranty of merchantability, FCA warranted that the Defective Class Vehicles were fit for their ordinary purpose as safe motor vehicles and would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

97.     FCA breached its implied warranties, as described in more detail above, and is therefore liable to Plaintiffs pursuant to 15 U.S.C. § 2310(d)(1). Without limitation, the Defective Class Vehicles share a common defect in that they

are all equipped with a Hybrid Propulsion System that makes the vehicles susceptible to a risk of spontaneous ignition, causing an unreasonable risk of death, serious bodily harm and/or property damage to lessees and owners of the Defective Class Vehicles as well as their homes, passengers and bystanders. This defect rendered the Defective Class Vehicles when sold/leased and at all times thereafter, unmerchantable and unfit for their ordinary use of hybrid driving. In fact, as a result of the defect, FCA specifically advises owners and lessees not to charge their batteries and not to drive the Defective Class Vehicles in electric mode.

98.     In its capacity as warrantor and a result of its monitoring obligations under the TREAD Act as discussed above, FCA had knowledge of the inherently defective nature of the Hybrid Propulsion System in the Defective Class Vehicles long before Class members knew of the defect. Any effort by FCA to limit the implied warranties in a manner that would exclude coverage of the Defective Class Vehicles is unconscionable, and any such effort to disclaim or otherwise limit such liability is null and void.

99.     Any limitations FCA might seek to impose on  its warranties are procedurally unconscionable. There was unequal bargaining power between FCA and Plaintiffs at the time of purchase and lease,  Plaintiffs had no other options for purchasing warranty coverage other than directly from FCA.

100.   Any limitations FCA might seek to impose on its warranties are substantively unconscionable. FCA knew that the Defective Class Vehicles were defective and that the Defective Class Vehicles could spontaneously ignite when used as intended long before Plaintiffs and the Class. FCA failed to disclose this defect to Plaintiffs and the Class. Thus, enforcement of the durational limitations on the warranties is harsh and shocks the conscience.

101.   Plaintiffs have had sufficient direct dealings with either FCA or its agents (dealerships) to establish privity of contract between FCA and Plaintiffs. Nonetheless, privity is not required here because Plaintiffs are intended third-party beneficiaries of contracts between FCA and its dealers, and specifically, of FCA's implied warranties. The dealers were not intended to be the ultimate consumers of the Defective Class Vehicles and have no rights under the warranty agreements provided with the Defective Class Vehicles; the warranty agreements were designed for and intended to benefit consumers. Finally, privity is also not required because the Defective Class Vehicles are dangerous instrumentalities due to the aforementioned defect, as spontaneous fires present an unreasonable risk of death, serious bodily harm and/or property damage to lessees and owners of the Defective Class Vehicles as well as their homes, passengers and bystanders.

102.   Pursuant to 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action and are not required to give FCA notice and an opportunity to cure until

such time as the Court determines the representative capacity of Plaintiffs pursuant to Rule 23 of the Federal Rules of Civil Procedure.

103. Plaintiffs would suffer economic hardship if they returned their Defective Class Vehicles but did not receive the return of all payments made by them. Because FCA will not acknowledge any revocation of acceptance and immediately return any payments made, Plaintiffs have not re-accepted their Defective Class Vehicles by retaining them.

104. The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit. Plaintiffs, individually and on behalf of all other Magnuson-Moss Class members, seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial. In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs and the other Magnuson-Moss Class members in connection with the commencement and prosecution of this action.

105. Plaintiffs also seek the establishment of an FCA-funded program for Plaintiffs and Magnuson-Moss Class members to recover out-of-pocket costs

incurred in attempting to rectify and/or mitigate the effects of the Hybrid Propulsion System Defect in their Defective Class Vehicles.

## COUNT II

## FRAUD BY CONCEALMENT
### (On behalf of Plaintiffs and the Nationwide Class (or alternatively State Subclasses)

106. Plaintiffs incorporate all of the preceding paragraphs by reference as though fully set forth herein.

107. The Defendant made material omissions concerning a presently existing or past fact in that, for example, Defendant did not fully and truthfully disclose to its customers the true nature of the Hybrid Propulsion Defect which was not readily discoverable by them until years after purchase or lease of the Defective Class Vehicles. These facts, and other facts as set forth above, were material because reasonable people attach importance to their existence or nonexistence in deciding which vehicle to purchase.

108. Defendant was under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated. One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

109. In addition, Defendant had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendant who has superior

knowledge and access to the facts, and Defendant knew said material facts were not known to or reasonably discoverable by Plaintiffs and the Class. These omitted facts were material because they directly impact the safety of the Defective Class Vehicles.

110. Defendant was in exclusive control of the material facts and such facts were not known to the public or the Class. Defendant also possessed exclusive knowledge of the defects rendering Defective Class Vehicles inherently more dangerous and unreliable than similar vehicles.

111. Defendant actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiffs and the Class to purchase the Defective Class Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

112. Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. The actions of Plaintiffs and the Class were justified.

113. As a result of the concealment and/or suppression of the facts, Plaintiffs and the Class sustained damage. For those Class Members who elect to affirm the sale, these damages include the difference between the actual value of that which Plaintiffs and the Class paid and the actual value of that which they received, together with additional damages arising from the sales transaction, amounts

expended in reliance upon the fraud, compensation for loss of use and enjoyment of the property, and/or lost profits. For those who want to rescind the purchase, they are entitled to restitution and consequential damages. Defendant's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights and well-being of Plaintiffs and the Class in order to enrich Defendant. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

### UNJUST ENRICHMENT
**(On behalf of Plaintiffs and the Nationwide Class (or alternatively State Subclasses)**

114.   Plaintiffs incorporate all of the preceding paragraphs by reference as though fully set forth herein.

115.   This Count is asserted for restitution based on Defendant's unjust enrichment. Plaintiffs assert this cause of action on behalf of themselves and the Class.

116.   As a result of the wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design and/or manufacturing defect of their vehicles and the concealment of the defect, Defendant charged a higher price for its vehicles

than the vehicles' true value and Defendant obtained monies which rightfully belong to Plaintiffs and other Class Members.

117. Plaintiffs and Class Members conferred a benefit on FCA.

118. Defendant enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members, who paid a higher price for vehicles which actually had lower values. It would be inequitable and unjust for Defendant to retain these wrongfully obtained profits.

119. Plaintiffs, therefore, seek an order establishing Defendant as a constructive trustee of the profits unjustly obtained, plus interest.

## COUNT IV

### NEGLIGENTMISREPRESENTATION
**(On behalf of Plaintiffs and the Nationwide Class (or alternatively State Subclasses)**

120. Plaintiffs incorporate all of the preceding paragraphs by reference as though fully set forth herein.

121. Defendant overstated the utility and safety of Defective Class Vehicles by marketing the Defective Class Vehicles as having over 100 safety and security features to keep consumers safe, and as the most family friendly minivan in its class.

122. Defendant's representations were not true because the Defective Class Vehicles are unsafe and unsuitable for any family. Plaintiffs and the Class members

cannot safely park their Defective Class Vehicles at home or near buildings, nor can they plug them in due to a heightened risk of fire.

123.   Defendant had no reasonable grounds for believing the representations were true when it made them.

124.   The misrepresentations, nondisclosure, and/or concealment of material facts made by Defendant to Plaintiffs and the members of the Class, as set forth above, were intended by Defendant to mislead Plaintiffs and the Class members.

125.   Plaintiffs and the Class members reasonably relied on Defendant's misrepresentations, but were actually misled and deceived, and were induced by Defendant to purchase the Class Vehicles which they could not otherwise have purchased.

126.   Plaintiffs and Class members' reliance was a substantial factor in causing them harm because they were required to stop using Defective Class Vehicles and fear immediate catastrophic injury to themselves, passengers of the Defective Class Vehicles, and people and property surrounding the Defective Class Vehicle.

127.   Plaintiffs and the Class members justifiably relied on Defendant's misrepresentations and have been damaged thereby.

## COUNT V
## NEGLIGENCE

**(On behalf of Plaintiffs and the Nationwide Class (or alternatively State Subclasses)**

128.   Plaintiffs incorporate all of the preceding paragraphs by reference as though fully set forth herein.

129.   Defendant had a duty to its consumers to exercise a degree of care that a reasonable person in the like position would exercise.  Defendant failed to do so. Among other things Defendant had a duty to follow industry custom and standards imposed by federal regulations, to assess the foreseeability and likelihood of an injury, and to assess the seriousness and frequency of the injuries threatened by the Defective Class Vehicles.

130.   Defendant breached its duty to Plaintiffs and the Class members. Among other things, and without limiting the generality of the foregoing, Defendant failed to (1) inspect its Defective Class Vehicles adequately, (2) design Defective Class Vehicles properly, and (3) test its Defective Class Vehicles adequately.

131.   Defendant's negligence was a substantial factor in causing Plaintiffs and Class members to suffer economic, and potentially fatal harm, as well as other damages to be proven at the time of the trial.

132.   Plaintiffs and Class members were harmed because they were in fear and at risk of immediate catastrophic injury to themselves and passengers of the Class Vehicles, and people and property surrounding the Defective Class Vehicle.

133.   As a direct and legal result of the wrongful acts and omissions of Defendant, Plaintiffs and Class members were harmed.

**B.     State-Specific Claims**

## COUNT VI

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
UNDER TEXAS LAW
(Tex. Bus. & Com. Code §§ 2.314 and 2A.212)
(Asserted by Meagan and Cal Findeiss on behalf of themselves and the Texas
Class)**

134.   Plaintiffs Meagan and Cal Findeiss incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

135.   Plaintiffs Findeiss assert this claim on behalf of themselves and the Texas Class.

136.   FCA is a merchant with respect to motor vehicles under Texas Bus. & Com. Code § 2.104(1) and 2A.103(a)(20), and a "seller" of goods under §§ 2.103(a)(4) and 2.105. With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Tex. Bus. & Com. Code § 2A.103(a)(16).

137.   The Defective Class Vehicles are and were at all relevant times "goods" within the meaning of Texas Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

138.   The Defective Class Vehicles were each subject to implied warranties of merchantability, as defined in Tex. Bus. & Com. Code § 2.314 and 2A.212, running from the Defendant to Plaintiffs Findeiss and the Texas Class.

139.   An implied warranty that the subject vehicles were merchantable arose by operation of law as part of the purchase of the subject vehicles.

140.   Defendant breached the implied warranty of merchantability in that the Defective Class Vehicles were not in merchantable condition when they were sold or leased to Mr. and Mrs. Findeiss and Texas Class members and all times thereafter, and said vehicles were and are unfit for the ordinary purposes for which such vehicle is used.

141.   The Defective Class Vehicles were not merchantable when sold or leased at all times thereafter because their Hybrid Propulsion Systems are prone to spontaneous ignition, and pose an unreasonable risk of fires due to the Hybrid Propulsion Defect as described herein. Without limitation, the Defective Class Vehicles share a common defect in that they are all equipped with a Hybrid Propulsion System that makes the vehicles susceptible to a risk of spontaneous ignition, causing an unreasonable risk of death, serious bodily harm and/or property damage to lessees and owners of the Affected Vehicles as well as their homes, passengers and bystanders. This defect renders the Defective Class Vehicles when sold/leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving. In fact, as a result of the defect, FCA specifically advises owners and lessees not to charge their batteries and not to drive the Defective Class Vehicles in electric mode.

142.   Defendant has been provided notice of these issues by numerous complaints, as alleged herein.

143.   As a direct and proximate result of Defendant's breach of the implied warranty of merchantability, said Plaintiffs and the Texas Class members have suffered damages, including but not limited to incidental and consequential damages.

## COUNT VII

### BREACH OF EXPRESS WARRANTIES UNDER TEXAS LAW
**(Tex. Bus. & Com. Code § 2.313 and 2A.210)**
**(Asserted by Meagan and Cal Findeiss on behalf of themselves and the Texas Class)**

144.   Plaintiffs Meagan and Cal Findeiss incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

145.   Plaintiffs Findeiss assert this claim on behalf of themselves and the Texas Class.

146.   Defendant is and was at all relevant times a "merchant" with respect to motor vehicles under Texas Bus. & Com. Code §§ 2.104(1) and 2A.103(a)(20), and a "seller" of motor vehicles under § 2.103(a)(4).

147.   With respect to leases, Defendant is and was at all relevant times a "lessor" of motor vehicles under Texas Bus. & Com. Code § 2A.103(a)(16).

148.   The Defective Class Vehicles are and were at all relevant times "goods" within the meaning of Texas Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

42

149.   In connection with the sale and lease of the Defective Class Vehicles to Plaintiffs Meagan and Cal Findeiss and the Texas Class, Defendant provided a new vehicle warranty, under which it agreed to repair original components found to be defective in material or workmanship under normal use and maintenance, including the engine and its components.

150.   Defendant's express warranties were part of the basis of the bargain respecting the purchase and/or lease of the Defective Class Vehicles. In addition to written warranties, Defendant warranted several attributes, characteristics, and qualities of the subject vehicles, as alleged above.

151.   Defendant's warranty of repair and/or adjustment of defective parts fails in its essential purpose because the contractual remedy is not adequate or sufficient to truly remedy the problem or make Plaintiffs Meagan and Cal Findeiss and the Texas Class members whole, and also because they do not adequately provide remediation.

152.   Plaintiffs Findeiss and the Texas Class relied on Defendant's express warranty, which was a material part of the bargain, when purchasing or leasing the Defective Class Vehicles.

153.   Accordingly, Plaintiffs Findeiss, and the Texas Class members seek all remedies as allowed by law.

43

154.   Also, as alleged in more detail herein, at the time that Defendant warranted and sold the vehicles, it knew that the vehicles did not conform to the warranties and were inherently defective, and Defendant wrongfully and fraudulently misrepresented and/or concealed material facts regarding their vehicles. Plaintiffs Findeiss and the Texas Class members were therefore induced to purchase the Defective Class Vehicles under false and/or fraudulent pretenses.

155.   Defendant has been provided notice of these issues by numerous complaints as described herein.[2]

156.   Defendant has been afforded a reasonable opportunity to cure said Hybrid Propulsion Defect of the Defective Class Vehicles, but Defendant has been unable and/or has refused to do so within a reasonable time.

157.   As a result of said nonconformities, Plaintiffs Meagan and Cal Findeiss and the Texas Class members cannot reasonably rely on the subject vehicles for the ordinary purpose of safe, comfortable, and efficient transportation.

---

[2]   On April 13, 2022, Plaintiffs Meagan and Cal Findeiss made a written demand for relief and notified FCA of its 60-day right to cure, by certified letter upon Defendant pursuant to the Texas Deceptive Practices Act, Tex. Bus. & Com. Code §17.41 *et seq*.  This pre-suit demand is without prejudice to Plaintiffs' position that any such demand is excused or waived, or is otherwise futile as Defendant is fully aware of the defect plaguing the Defective Class Vehicles and has issued a Recall but has not remedied the defect nor provided Plaintiffs and Class members with appropriate replacement vehicles, repurchased the vehicles from Plaintiffs and Class members, or refunded their purchase price, at Defendant's sold and own cost.  Plaintiffs will amend this complaint after 60 days have elapsed from Defendant's receipt of their pre-suit demand to assert a claim against FCA arising under the Texas Deceptive Practices Act, as noted herein.

158.   The aforesaid Plaintiffs could not reasonably have discovered said nonconformities with the subject vehicles prior to their acceptance of the subject vehicle.

159.   Plaintiffs Meagan and Cal Findeiss would not have purchased their subject vehicles, or would have paid less for them had they known, prior to their respective time of purchase or lease, that the subject vehicles were tainted by the said Defect.

160.   As a direct and proximate result of the willful failure of Defendant to comply with its obligations under the express warranties, said Plaintiffs and the Texas Class members have suffered actual and consequential damages. Such damages include, but are not limited to, a diminution in the value of the subject vehicles containing the defects identified herein.

## COUNT VIII

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## UNDER OREGON LAW (OR. REV. STAT. § 72.3140)
**(Asserted by Plaintiffs Clea and Ladd Van Tol on behalf of themselves
and the Oregon Class)**

161.   Plaintiffs Clea and Ladd Van Tol incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

162.   Plaintiffs Van Tol assert this claim on behalf of themselves and the Oregon Class.

163.   FCA is a "merchant" within the meaning of Or. Rev. Stat. § 72.1040(1), and "seller" of motor vehicles within the meaning of Or. Rev. Stat. § 72.1030(1)(d). The Defective Class Vehicles are "goods" under Or. Rev. Stat. § 72.5010 (see Or. Rev. Stat. § 72.1030(2)(m)).

164.   Under Or. Rev. Stat. § 72.3140, an implied warranty of merchantability attaches to the Defective Class Vehicles.

165.   The Defective Class Vehicles were not merchantable when sold or leased, and all times thereafter, because their Hybrid Propulsion Systems are prone to spontaneous ignition, and pose an unreasonable risk of fires due to the Hybrid Propulsion Defect as described herein. Without limitation, the Defective Class Vehicles share a common defect in that they are all equipped with a Hybrid Propulsion System that makes the vehicles susceptible to a risk of spontaneous ignition, causing an unreasonable risk of death, serious bodily harm and/or property damage to lessees and owners of the said Vehicles as well as their homes, passengers, and bystanders. This defect renders the Defective Class Vehicles when sold/leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving. In fact, as a result of the defect, FCA specifically advises owners and lessees not to charge their batteries and not to drive the said Vehicles in electric mode.

166.   Plaintiffs Van Tol and the other Oregon Class members were and are third-party beneficiaries of FCA's contracts with FCA-certified/authorized retailers who sold or leased the said Vehicles to Plaintiffs Van Tol and Oregon Class members.

167.   FCA was provided notice of these issues within a reasonable time of Plaintiffs' knowledge of the non-conforming or defective nature of the Defective Class Vehicles by the filing of this Complaint, by consumer complaints to NHTSA regarding the defect that is the subject of this Complaint, and/or by the allegations contained in this Complaint. In addition, on or about April 14, 2022, Plaintiffs Clea and Ladd Van Tol sent notice letters to FCA complying with Or. Rev. Stat. § 72.3140, *et seq*., to the extent such notice is required. Unless FCA remedies the Hybrid Propulsion Defect within the requisite time period, Plaintiffs Van Tol and the Oregon Class will seek all damages and relief to which they are entitled.

168.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiffs Van Tol and the other Oregon Class members have been damaged in an amount to be determined at trial.

## PRAYER FOR RELIEF

169.   **WHEREFORE**, Plaintiffs, on behalf of themselves and members of the respective classes, as appropriate, respectfully request that this Court:

(a)    determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Class as defined above;

(b)    appoint Plaintiffs Meagan and Cal Findeiss as representatives of the Nationwide Class and the Texas Class, as appropriate, and their counsel as Class counsel;

(c)    appoint Plaintiffs Clea and Ladd Van Tol as representatives of the Nationwide Class and the Oregon Class, as appropriate, and their counsel as Class Counsel;

(d)    award all actual, general, special, incidental, statutory, punitive, and consequential damages and restitution to which Plaintiffs and members of the Classes are entitled under the claims and causes of action as alleged above, at this time;

(e)    award pre-judgment and post-judgment interest on any monetary relief;

(f)    grant appropriate injunctive and/or declaratory relief, including, without limitation, an order that requires FCA to repair, recall, and/or replace the Class vehicles and to extend the applicable warranties to a reasonable period of time, or, at a minimum, to provide Plaintiffs and Class members with appropriate curative notice regarding the existence and cause of the Defect;

48

(g)   award reasonable attorneys' fees and costs; and

(h)   grant such further relief that this Court deems appropriate.

**TRIAL BY JURY DEMANDED ON ALL COUNTS**

Date: April 21, 2022                    By: */s/ E. Powell Miller*

                                                  E. Powell Miller

E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
**The Miller Law Firm PC**
950 W. University Dr., Ste. 300
Rochester, MI 48307
Telephone: (248) 841-2200
Facsimile: (248) 652-2852
epm@millerlawpc.com
ssa@millerlawpc.com


**BARRACK, RODOS, & BACINE**
Stephen R. Basser
Samuel M. Ward
600 W Broadway, Suite 900
San Diego, CA 92101
Telephone: (619)230-0800
Facsimile: (619) 230-1874
sbasser@barrack.com
sward@barrack.com


**BARRACK, RODOS & BACINE**
Jeffrey W. Golan
Two Commerce Square
2001 Market Street, Suite 3300
Philadelphia, PA  19103
Telephone: (215) 963-0600
jgolan@barrack.com

49

**EMERSON FIRM, PLLC**
John G. Emerson
2500 Wilcrest Drive, Suite 300
Houston, TX 77042
Telephone: (800) 551-8649
Facsimile: (501) 286-4659
jemerson@emersonfirm.com

Attorneys for Plaintiffs and the
Proposed Class

50